STEPHEN L. PORTER – SBN 067177
WHITEHEAD & PORTER LLP
220 Montgomery Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 781-6070
Facsimile: (415) 788-6521

ADAM M. TSCHOP – SBN 209767
APPLIED BIOSYSTEMS, LLC
850 Lincoln Centre Drive
Foster City, CA 94043
Telephone: (650) 570-6667
Facsimile: (650) 554-2935

Attorneys for Plaintiff
Applied Biosystems, LLC

*RS*

## UNITED STATED DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

APPLIED BIOSYSTEMS, LLC, a
Delaware limited liability company

Plaintiff,

vs.

HOFFMANN-LA ROCHE INC., a New
Jersey corporation

Defendant.

Case No. **10   3096**

**COMPLAINT FOR
CONTRACTUAL INDEMNITY**

**DEMAND FOR JURY TRIAL**

Plaintiff Applied Biosystems, LLC ("AB") alleges:

**Jurisdictional Allegations**

1.     Jurisdiction exists in this diversity case under 28 U.S.C. §1332, and the amount in controversy exceeds the statutory minimum.

2.     Venue lies in this district under 28 U.S.C §1931(a)(2), in that a substantial part of the events or omissions on which the claim is based occurred in this district. The contract upon which this claim is based was to be performed in this district, and defendant's breach of the contract occurred in this district.

**The Parties**

3.     Plaintiff AB is a Delaware limited liability company with its principal place of business in Foster City, California. AB is duly qualified to conduct business in this state.

1

WHITEHEAD & PORTER LLP
220 Montgomery Street, Suite 1850
San Francisco, CA 94104

1       4.     AB is informed and believes, and thereupon alleges, that defendant Hoffmann-

2   La Roche, Inc. ("Roche") is a New Jersey corporation duly qualified to conduct business in this

3   state and that Roche conducts business in this state, including through subsidiaries, affiliates

4   and related entities.

5       5.     AB is the successor-in-interest to Applied Biosystems Inc., a Delaware

6   corporation, previously named Applera Corporation. Under the Applera Corporation name, the

7   corporation was structured, and operated, through two unincorporated business groups, Applied

8   Biosystems and Celera. On July 1, 2008, Applera spun off its Celera Group into Celera

9   Corporation, and changed its corporate name to Applied Biosystems Inc. Applera was the

10  successor-in-interest to PE Corporation (NY), previously named The Perkin-Elmer

11  Corporation, a New York corporation ("P-E"), which conducted business through an

12  unincorporated business group that was named PE Biosystems Group and then PE Applied

13  Biosystems. Excluding Celera, all of the foregoing entities and groups conducted business in

14  Foster City, California, and AB is the successor-in-interest to them.

15                                **Substantive Allegations**

16      6.     On July 19, 1991, P-E and Roche entered an Acquisition Agreement

17  ("Agreement"), a copy of which (without Schedules and Exhibits which are not relevant to this

18  action) is attached as Exhibit A hereto and incorporated by this reference.

19      7.     The Agreement defines "Losses" in Section 11.1 to be "any losses, claims,

20  Liabilities, damages or expense (including reasonable attorneys' fees)".

21      8.     Section 11.2 of the Agreement required Roche to indemnify P-E and hold it

22  harmless from "Losses" resulting from:

23          (a) Liabilities arising subsequent to the Closing out of or relating to the ownership of,

24          and the conduct of the business involving, the U.S. Interests, or any assets acquired

25          pursuant to the U.S. Cetus Agreement (other than the Cetus Instrument Interests);

26          …

27          (d) the U.S. Assumed Liabilities; [and]

28          …

WHITEHEAD & PORTER LLP
220 Montgomery Street, Suite 1850
San Francisco, CA 94104

2

COMPLAINT FOR CONTRACTUAL INDEMNITY; Case no.

1  (f) Liabilities, including any such Liabilities that are Unassumed Liabilities and without

2  regard to the threshold set forth in Section 11.2(g) hereof, and without regard to Section

3  11.2(h) hereof, relating to patents of Cetus or PECI that do not relate to instruments.

4      9.     On September 23, 2004, a Class Action Complaint was filed by Molecular

5  Diagnostic Laboratories against P-E and other defendants (including Roche) in the United

6  States District Court for the District of Columbia, Action No. 1:04CV01649 (the "MDL

7  Action").

8      10.    The MDL Action alleged that P-E was liable for damages arising from U.S.

9  Patent No. 4,889,818 (the "'818 patent").

10      11.    After the Agreement was entered, the '818 patent was an asset acquired by

11  Roche from Cetus pursuant to the "U.S. Cetus Agreement" as defined in the Agreement.  The

12  '818 patent was not a "Cetus Instrument Interest" as defined in the Agreement.

13      12.    After the Agreement was entered, Roche was obligated to indemnify and hold

14  harmless P-E from liability for "Losses" arising from the '818 patent.

15      13.    The MDL Action was settled in September 2008.

16      14.    In defending the MDL Action, AB (as successor to the entities and groups

17  identified in paragraph 3 above) incurred attorneys' fees and expenses in an amount exceeding

18  $1,000,000 ("Fees").

19      15.    The Fees were "Losses," for which Roche was obligated to indemnify P-E,

20  including those in Section 11.2(a),(d) and (f) of the Agreement.   The Fees were reasonable in

21  amount.

22      16.    On May 11, 2010, AB demanded indemnity from Roche under the Agreement as

23  a result of the MDL Action, specifically that Roche reimburse AB for the Fees.  Roche did not

24  respond to AB's demand, as a result of which AB alleges, on information and belief, that

25  Roche has refused to indemnify AB.

26      17.    Roche's refusal to indemnify AB and hold it harmless from the Fees is a breach

27  of Section 11.2 of the Agreement.

28      18.    AB (and its predecessors-in-interest) performed all actions required of it under

WHITEHEAD & PORTER LLP
220 Montgomery Street, Suite 1850
San Francisco, CA 94104

3

1    the Agreement.

2        19.     As a result of Roche's breach, AB has been damaged in an amount exceeding

3    $1,000,000.

4        20.     Additionally, AB will incur expenses to obtain the indemnity rights provided by

5    Section 11.2 of the Agreement.

6        Wherefore, AB prays for relief as set forth below.

7                                    **PRAYER**

8        AB prays for judgment against Roche as follows:

9        1. Damages in the amount of the Fees,

10       2. Prejudgment interest as allowed by law,

11       3. Expenses incurred in obtaining indemnity under the Agreement,

12       4. Costs of suit and

13       5. Such further relief as the Court deems proper in the circumstances.

14       Dated: _Jly /4_ , 2010                    Whitehead & Porter LLP

15                                          By: _Stephen L. Porter SPM_
                                            Stephen L. Porter
16                                          Attorneys for Applied Biosystems, LLC

17

18

19

20

21

22

23

24

25

26

27

28

WHITEHEAD & PORTER LLP
220 Montgomery Street, Suite 1850
San Francisco, CA 94104

                                    4

COMPLAINT FOR CONTRACTUAL INDEMNITY; Case no.

1  **DEMAND FOR JURY TRIAL**

2  Plaintiff Applied Biosystems, LLC demands a trial by jury.

3  Dated: _____ , 2010                                    Whitehead & Porter LLP

4  By: _____

5  Stephen L. Porter

6  Attorneys for Applied Biosystems, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

COMPLAINT FOR CONTRACTUAL INDEMNITY; Case no.

Exhibit A

#563

\*\*

ACQUISITION AGREEMENT

Dated as of July 19, 1991

among

THE PERKIN-ELMER CORPORATION

and

HOFFMANN-LA ROCHE INC.

and

ROCHE PROBE, INC.

**★★**

## TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS..............................2

SECTION 2.  PURCHASE AND SALE.......................11

SECTION 3.  CLOSING................................15

SECTION 4.  REPRESENTATIONS AND WARRANTIES OF
            PERKIN-ELMER...........................15

SECTION 5.  REPRESENTATIONS AND WARRANTIES OF ROCHE...23

SECTION 6.  REPRESENTATIONS AND WARRANTIES OF RPI.....25

SECTION 7.  COVENANTS OF PERKIN-ELMER................27

SECTION 8.  COVENANTS OF ROCHE AND RPI...............30

SECTION 9.  CONDITIONS PRECEDENT TO ROCHE'S
            AND RPI'S OBLIGATIONS....................32

SECTION 10. CONDITIONS PRECEDENT TO
            PERKIN-ELMER'S OBLIGATIONS...............34

SECTION 11. INDEMNIFICATION; SURVIVAL................36

SECTION 12. TERMINATION.............................40

SECTION 13. MISCELLANEOUS...........................41

\*\*

## SCHEDULES

Schedule 1     Other Liabilities

Schedule 2.3    Royalty Percentage

Schedule 4.6(a)(i)  Claims

Schedule 4.6(a)(ii) Claims Having a Material Adverse Effect

Schedule 4.6(b)   Actions or Suits

Schedule 4.8(i)   Non-Compliance with Law

Schedule 4.8(ii)  Notice of Non-Compliance with Law

Schedule 4.9    Permits

Schedule 4.10    Material Adverse Change

Schedule 4.11    Taxes

Schedule 4.12(a)  Environmental Permits

Schedule 4.12(b)  Environmental Non-Compliance

Schedule 4.12(d)  Wastes

Schedule 4.12(e)  Environmental Liens and Encumbrances

Schedule 4.13    Contracts

## EXHIBITS

Exhibit 2.4    Terms of Preferred Stock

Exhibit 3     Distribution Agreement

Exhibit 5.6    Excerpts from U.S. Cetus Agreement

Exhibit 9.3(b)   Opinion of Perkin-Elmer's General Counsel

Exhibit 10.3(a)  Opinion of Roche's General Counsel

\*\*

## ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT is entered into as of July 19, 1991 by and among THE PERKIN-ELMER CORPORATION, a New York corporation with offices at 761 Main Avenue, Norwalk, CT 06859 ("Perkin-Elmer"), HOFFMANN-LA ROCHE INC., a New Jersey corporation with offices at 340 Kingsland Street, Nutley, NJ 07110 ("Roche"), and ROCHE PROBE, INC., a Delaware corporation with offices at 340 Kingsland Street, Nutley, NJ 07710 ("RPI").

W I T N E S S E T H:

WHEREAS, Roche intends to be engaged through RPI, among other things, in the business of developing, manufacturing and commercializing products used in or with polymerase chain reaction technology; and

WHEREAS, Perkin-Elmer and Cetus Corporation, a Delaware corporation ("Cetus"), presently are engaged in certain aspects of the business of developing, manufacturing and commercializing products used in or with polymerase chain reaction technology through Perkin-Elmer/Cetus Instruments, a New York general partnership ("PECI"); and

WHEREAS, Perkin-Elmer and Cetus simultaneously herewith have entered into an agreement to terminate and dissolve PECI (the "Termination Agreement"); and

WHEREAS, in order to pursue the business of developing and commercializing the polymerase chain reaction technology and as an inducement to Perkin-Elmer and Cetus to terminate and dissolve PECI, (i) Roche and RPI have entered into this Agreement, (ii) F. Hoffmann-La Roche Ltd. ("FHLR"), an Affiliate (as hereinafter defined) of Roche, has entered into an Acquisition Agreement of even date herewith (the "Non-U.S. Agreement") with Perkin-Elmer to acquire certain non-U.S. interests of Perkin-Elmer in and to polymerase chain reaction technology, (iii) Roche has entered into an Asset Purchase Agreement of even date herewith (the "U.S. Cetus Agreement") with Cetus to acquire all of Cetus' U.S. interests in and to polymerase chain reaction technology and (iv) FHLR has entered into an Asset Purchase Agreement of even date herewith (the "Non-U.S. Cetus Agreement") with Cetus to acquire all of Cetus' non-U.S. interests in and to polymerase chain reaction technology; and

\*\*

- 2 -

WHEREAS, Perkin-Elmer either directly or indirectly through PECI is engaged, among other things, in the business of developing, manufacturing and distributing instruments and other products for use with polymerase chain reaction technology; and

WHEREAS, at Closing (as hereinafter defined) Perkin-Elmer will be the owner of the U.S. Interests (as hereinafter defined) and the non-U.S. Interests (as hereinafter defined); and

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Perkin-Elmer desires to sell to Roche, the U.S. Interests; and

WHEREAS, in order to pursue the business of developing and commercializing polymerase chain reaction technology and as an inducement to Perkin-Elmer to terminate and dissolve PECI, Roche desires to purchase from Perkin-Elmer the U.S. Interests and assume the U.S. Assumed Liabilities (as hereinafter defined) on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:


SECTION 1.  DEFINITIONS.

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Acquisition Agreements" means this Agreement and the Non-U.S. Agreement as such term is defined in the recitals of this Agreement.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, Controls, is Controlled by or is under common Control with such Person; provided that Perkin-Elmer shall not be deemed an Affiliate of Cetus and Cetus shall not be deemed to be an Affiliate of Perkin-Elmer; and provided further that Genentech shall not be deemed to be an Affiliate of Roche until such time, if any, as (i) Roche notifies Perkin-Elmer, in writing, through the Advisory Committee, that Genentech should be considered an Affiliate of Roche for purposes of this Agreement or (ii) Roche or any of its Affiliates (A) provides Genentech with any confidential or proprietary information relating to PCR Technology or NA

**

Amplification Technology not generally provided or made available to third parties that is or could be material to the development of any product or technology by Genentech or (B) enters into any agreement or arrangement with Genentech or any of Genentech's Affiliates that would permit Genentech to practice PCR Technology or NA Amplification Technology other than (y) pursuant to a contractual arrangement on arm's length terms or (z) as a result of the purchase of Products or Combination Products.

"Assumed Liabilities" means all Liabilities that arise out of or relate to the conduct of PECI's Business or PECI's Assets and Property that (i)(A) are fixed as to the amount thereof as of the date hereof, and (B) are either (x) reflected in PECI's financial statements as of March 31, 1991, (y) disclosed to Roche or FHLR by Perkin-Elmer pursuant to the Acquisition Agreements or by Cetus pursuant to the Cetus Agreements or (z) are within Roche's Knowledge as of the date hereof, (ii) are not disclosed to Roche or FHLR by Perkin-Elmer pursuant to the Acquisition Agreements or by Cetus pursuant to the Cetus Agreements only to the extent not required to be disclosed therein by the materiality or other qualifiers (other than the knowledge qualifier in the last sentence of Section 4.5 hereof) contained in the representations in such agreements, or (iii) are specified in Schedule 1 hereto but only to the extent specified in Schedule 1.

"Balance Sheet Date" means June 30, 1990.

"Cetus" has the meaning set forth in the recitals of this Agreement.

"Cetus Agreements" means the U.S. Cetus Agreement and the Non-U.S. Cetus Agreement as such terms are defined in the recitals of this Agreement.

"Cetus Instrument Interest" means all interests, Permits and Rights owned or claimed by Cetus or Roche or any of their Affiliates arising from PECI, the PECI Agreement, the dissolution or liquidation of PECI, or the U.S. Cetus Agreement whether or not in existence on the date hereof, including, without limitation, any distribution, manufacturing, ownership or use Rights or Permits, patents, patent applications, trade secrets, know-how and proprietary Rights of any kind and any economic or ownership interests but only to the extent that any of the foregoing relate to instruments.

\*\*

- 4 -

"Claims" means all actions, causes of action, suits, debts, dues, bonds, controversies, trespasses, damages, judgments, executions, claims, investigations, prosecutions and demands whatsoever, in law or equity.

"Contracts" means all contracts, agreements, leases, bids, purchase or sale orders, licenses and binding commitments.

"Control" or "Controlled" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

"Closing" shall have the meaning specified in Section 3 hereof.

"Closing Date" shall have the meaning specified in Section 3 hereof.

"Distribution Agreement" means the Distribution Agreement between Roche and Perkin-Elmer to be executed and delivered by the parties thereto at the Closing, the form of which is attached hereto as Exhibit 3, including all Schedules and Exhibits thereto.

"Effective Time" shall have the meaning specified in Section 3 hereof.

"Environmental Laws" means all federal, state, local and foreign laws, statutes, rules, regulations, ordinances, codes, judicial or administrative orders, requirements, standards, guidelines, and the like (collectively "laws"), relating to pollution, worker and public health and safety, or the protection of the environment, including, but not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 1857 et seq., the Occupational Safety and Health Act of 1970, 29 U.S.C. §651 et seq., and the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., and including, but not limited to, all laws relating to the release, use, manufacture, storage, treatment, transportation, discharge, disposal or other handling of hazardous materials, hazardous substances, or Wastes. The term Environmental Laws shall also include

**

- 5 -

Liabilities and duties arising under any state or
federal common law in connection with any of the
foregoing.

"Environmental Liabilities" means all Liabilities
arising under or in connection with the Environmental
Laws or otherwise arising out of or resulting from the
presence or use of hazardous substances or Wastes on,
under or from properties owned or leased or previously
owned or leased by PECI, or by Perkin-Elmer or CETUS in
connection with the conduct of PECI's business,
including without limitation, costs of investigation and
remediation.

"Environmental Permits" means all Permits
required by Environmental Laws other than those required
for the operation, if any, of PECI's Business in the
State of California.

"Exon-Florio" means the Exon-Florio Amendments to
the Defense Production Act.

"Export Regulations" means the Export
Administration Regulations of the Office of Export
Administration in the International Trade Administration
of the United States Department of Commerce, 15 C.F.R.
§ 368 et seq.

"GAAP" means generally accepted accounting
principles.

"Genentech" means Genentech, Inc., a Delaware
corporation.

"HSR Act" means the Hart-Scott-Rodino Antitrust
Improvements Act of 1976, as amended.

"IGEN Technology" means technology developed
pursuant to the Agreement between IGEN Inc. and Perkin-
Elmer dated March 30, 1990.

"Indemnified Party" shall have the meaning
specified in Section 11.3(a).

"Indemnifying Party" shall have the meaning
specified in Section 11.3(a).

"Interests" means all interests, Permits and
Rights in or relating to PCR Technology or NA
Amplification Technology or products used in PCR
Technology or NA Amplification Technology owned or

**

- 6 -

claimed by Perkin-Elmer arising from PECI, the PECI Agreement or the dissolution or liquidation of PECI, whether or not in existence on the date hereof, including, without limitation, any distribution, manufacturing, ownership or use Rights or Permits, patents, patent applications, trade secrets, know-how and proprietary Rights of any kind and any economic or ownership interests, but excluding only the Cetus Instrument Interest and the Retained Interests.

"Liabilities" means liabilities, debts or obligations, whether accrued, absolute, contingent or otherwise.

"Lien or Other Encumbrance" means any mortgage, lien, pledge, security interest, lease, easement, charge, option, Right of first refusal, restrictive covenant or other encumbrance, restriction or limitation, other than (i) liens for taxes, assessments and other governmental charges or levies not due and payable, or which currently are being contested in good faith by appropriate proceedings, (ii) mechanics', workmen's, repairmen's, materialmen's, warehousemen's, vendors' and carriers' liens, and other similar liens arising in the ordinary course of business for charges which are not delinquent, or which currently are being contested in good faith by appropriate proceedings and have not proceeded to judgment, (iii) any of the foregoing in respect of judgments or awards with respect to which there shall be a good faith current prosecution of an appeal or proceedings for review which is secured by an appropriate bond or a stay of execution pending such appeal or proceedings for review, and (iv) when used with respect to PECI or Perkin-Elmer, mortgages, liens, pledges, security interests, easements, charges, options, Rights of first refusal, restrictive covenants or other encumbrances or restrictions which would not, individually or in the aggregate, materially adversely impair the value of PECI's Business or PECI's Assets and Property or have a Material Adverse Effect.

"Light Scattering Molecular Weight Detection Technology" means the technology developed by Cetus and listed as item 3 of Schedule 1 to the Termination Agreement.

"Liquid Chromotography Technology" means the technology developed by Cetus and listed as item 4 of Schedule 1 to the Termination Agreement.

**

- 7 -

"Losses" has the meaning set forth in Section 11.1 hereof.

"Material Adverse Effect" means a material adverse effect on the value of PECI's Business or PECI's Assets and Property.

"Net Revenues" means the following: (a) with respect to the sale of Products in the United States by Perkin-Elmer pursuant to the Distribution Agreement, the Net Sales (as defined in the Distribution Agreement) generated by the sale of such Products in the United States, (b) with respect to all other sales of Products, Related Products, Blue Sky Products and Other Market Instruments, the net revenues actually received by Roche or any of its Affiliates from the sale of such Products, Related Products, Blue Sky Products or Other Market Instruments in the United States to third parties, after reflecting all deductions for returns (including withdrawals and recalls), sales rebates (price reductions and chargebacks), and volume (quantity) discounts all to the extent customarily given in the trade by Roche or its Affiliates except that discounts, credits or similar allowances provided to purchasers of Products and Related Products or Other Market Instruments by Roche or its Affiliates to purchasers of Products and Related Products or Other Market Instruments (as the case may be) in the United States only to the extent that such discounts, credits or other allowances are granted in consideration of the customer's agreement to purchase other products of Roche or its Affiliates shall not be deducted and after deducting all sales taxes or other taxes (except income taxes) paid by Roche or any of its Affiliates in connection with such sales, (c) with respect to PCR Services, the net revenues actually received by Roche or any of its Affiliates from the provision of such PCR Services to third parties in the United States, after deducting all rebates and discounts granted by Roche or any of its Affiliates in connection with such PCR Services (including without limitation the difference between the amount charged for a PCR Service and the Medicare and/or Medicaid limits of allowance and/or third party insurance program limits of allowance for such PCR Service), and after deducting all sales or other taxes (except income taxes) paid by Roche or any of its Affiliates in connection with the provision of such PCR Services, and (d) with respect to PCR Licenses, the net revenues actually received by Roche or any of its Affiliates from such PCR Licenses granted with respect to the United States or any portion thereof,

\* \*

- 8 -

after deducting all rebates and discounts granted by Roche or any of its Affiliates in connection with such PCR Licenses and after deducting all sales or other taxes (except income taxes) paid by Roche or any of its Affiliates in connection with such PCR Licenses. If a PCR Service is offered in combination with a non-PCR service or services and the combination is sold separately, the Net Revenues from such PCR Service for purposes of this Agreement shall be calculated by multiplying the Net Revenues that would have been generated if all such combined services were PCR Services by the fraction A/(A+B), where A is the list price charged by Roche or its Affiliate for such PCR Service and B is the list price charged by Roche or its Affiliate for such other service or services. If any of such services are not sold separately, such Net Revenues shall be allocated between the PCR Service and the other service or services in a manner that reasonably reflects the respective values thereof.

"Non-U.S. Assumed Liabilities" means all Assumed Liabilities other than U.S. Assumed Liabilities.

"Non-U.S. Interests" means all Interests other than U.S. Interests.

"Other Market Instruments" means instruments for use with PCR Technology or NA Amplification Technology that are sold or distributed in an Other Market by Roche, its Affiliates or any third party authorized by Roche.

"Other Markets" means the Retained Markets, any Blue Sky Market and the Human Identification Market.

"Other Revenues" has the meaning set forth in Section 2.3(b).

"PCR License" means a license granted by Roche or any of its Affiliates or any other Person authorized by Roche in any Designated Market or Other Market (other than Licenses granted pursuant to Section 4.13 of the Distribution Agreement) in the United States to any third party to utilize PCR Technology or NA Amplification Technology in such Market.

"PCR Services" means any use of PCR Technology authorized by Roche to provide data, results and/or interpretations of any application of PCR Technology or NA Amplification Technology to a Person other than Roche or its Affiliate for a fee.

"p-E Related Documents" shall have the meaning specified in Section 4.1 hereof.

"PECI" has the meaning set forth in the recitals.

"PECI Agreements" means, collectively, the Joint Venture Agreement, dated as of December 30, 1985, between Cetus and Perkin-Elmer and the related Distribution, Services and Technology License agreements executed in connection therewith.

"PECI's Assets and Property" means all assets and property of PECI, taken as a whole, other than patents related to noninstrument PCR Technology and other than assets and property relating to the Retained Interests.

"PECI's Business" or any variation thereof means the business of developing and commercializing PCR Technology, researching and developing applications for such PCR Technology, and manufacturing products incorporating, or useful in the application of, PCR Technology conducted by or for PECI, including, without limitation, research and development, manufacturing, distribution, licensing and consulting agreements and arrangements, excluding only any of the foregoing that relate to (i) the Retained Interests or (ii) patents relating to the noninstrument business of PECI and matters arising under the Environmental Laws or Environmental Permits or other environmental matters with respect to the facilities of Cetus or PECI relating to the conduct of the business of PECI, if any, in the State of California.

"Perkin-Elmer's Knowledge" or any variation thereof means the actual knowledge of any of the Perkin-Elmer members of the PECI management committee and Robert Board.

"Permits" means all permits, licenses, orders, authorizations or approvals of any federal, state, local or foreign governmental or regulatory body or authority.

"Person" means a natural person, a corporation, a partnership, a trust, a joint venture, any governmental authority or any other entity or organization.

"Retained Interests" means all interests, Permits and Rights and all Rights, title and interest in and to all proprietary Rights (including, without limitation, all patents, patent applications, patent disclosures,

and trade secrets) pertaining to instruments in or
relating to the development, manufacturing, use,
ownership or distribution of instruments developed by or
for PECI as of the date hereof, including, without
limitation, Perkin-Elmer Products and any assets set
forth in Schedule 1 to the Termination Agreement but
excluding any licenses or Rights to utilize PCR
Technology or to permit any acquiror or purchaser of any
instrument manufactured or distributed by Perkin-Elmer
or any of its Affiliates to utilize PCR Technology.
Notwithstanding the foregoing, Roche shall have the
Right to exclude from the definition of Retained
Interests (i) any reagents associated with IGEN
Technology, (ii) any reagents or reagent technology
developed or to be developed pursuant to the Systec
Agreement and (iii) the trademarks listed in item 7 of
Schedule 1 to the Termination Agreement that relate to
reagents. Roche shall exercise its Rights set forth in
the immediately preceding sentence by sending a notice
to Perkin-Elmer by the earlier of (i) ninety (90) days
after the date of this Agreement or (ii) ten (10) days
before the Closing.

"Right" means any right or benefit of any nature
whatsoever.

"Roche Related Documents" shall have the meaning
specified in Section 5.1 hereof.

"Roche's Knowledge" or any variation thereof
means the actual knowledge of the following officers of
Roche: Thomas MacMahon, Linda Seyffarth and Tom White.

"Royalties" shall have the meaning specified in
Section 2.3.

"Series TC 9600 Thermocycler" means the Series
TC 9600 thermocycler manufactured by Perkin-Elmer.

"Share" shall have the meaning specified in
Section 2.4 hereof.

"Systec Agreement" means the agreement between
PECI and Systec Inc. dated April 3, 1987 relating to
Systec's DNA synthesizer instrument Microsyn 1500.

"Termination Agreement" means the Termination and
Dissolution Agreement dated as of July 19, 1991 between
Perkin-Elmer and Cetus providing for the termination and
dissolution of PECI.

\*\*

- 11 -

"U.S. Assumed Liabilities" means Assumed
Liabilities that relate to the development, manufacture
or sale of products in the United States, the provision
of services in the United States, or the use of PCR
Technology in the United States.

"U.S. Interests" means Interests that relate to
the development, manufacture, or sale of products in the
United States, the provision of services in the United
States or the use of PCR Technology in the United
States.

"Unassumed Liabilities" means any Liabilities
arising out of or relating to the conduct of PECI's
Business or PECI's Assets and Property prior to the
Closing, whether asserted before or after the Closing,
excluding Assumed Liabilities.

"United States" means the United States of
America, its possessions and the Commonwealth of Puerto
Rico.

"Wastes" means any solid wastes, industrial
wastes, or hazardous wastes as defined now or in the
future under RCRA or CERCLA, and any other contaminants,
pollutants, raw materials, by-products, micro-organisms
or any other substances now or in the future defined as
a waste under any Environmental Laws.

Other terms defined in the Distribution Agreement
that are not defined in this Agreement shall have the
same meaning herein as therein.

SECTION 2.  PURCHASE AND SALE.

2.1  General.  On the terms and subject to the
conditions, and in reliance on the representations and
warranties, set forth herein, at the Closing Perkin-
Elmer shall sell, assign, transfer, convey and deliver
to Roche, and Roche shall purchase and acquire from
Perkin-Elmer the U.S. Interests and Roche shall assume
the U.S. Assumed Liabilities.

2.2  [intentionally omitted]

2.3  U.S. Royalties.  As partial consideration
for the sale of the Interests contemplated hereby, Roche
shall pay to Perkin-Elmer royalties on Net Revenues from
and after the Effective Time as follows (referred to
collectively as the "Royalties"):

\*\*

- 12 -

(a) <u>Designated Markets</u>. With respect to sales of the Products in the Designated Markets, Roche shall pay Perkin-Elmer a royalty equal to the percentage of Net Revenues attributable thereto determined in accordance with the second column on Schedule 2.3 hereto.

(b) <u>Other Markets</u>. With respect to sales of the Products (except for Products as defined in Clause (ii) of the definition of Products) , Related Products, Blue Sky Products, PCR Licenses or Other Market Instruments in any Other Market or any other net revenues ("Other Revenues") actually received by Roche or any of its Affiliates (other than from Perkin-Elmer pursuant to the Distribution Agreement and other than from PCR Services) derived in any way from PCR Technology or products used in or with PCR Technology in any Other Market in the United States, Roche shall pay Perkin-Elmer a royalty equal to the percentage of Net Revenues attributable to such sales and such Other Revenues determined in accordance with the third column on Schedule 2.3 hereto.

(c) <u>Sales of PCR Services</u>. With respect to sales of PCR Services, Roche shall pay Perkin-Elmer a royalty equal to the percentage of Net Revenues attributable thereto determined in accordance with the third column on Schedule 2.3 hereto.

(d) <u>Calculation; Reporting by Perkin-Elmer</u>. On or before either (i) March 31 (with respect to the six month period starting August 1 and ending January 31) or (ii) September 30 (with respect to the six month period starting February 1 and ending July 31), Perkin-Elmer shall notify Roche, in writing, of its Net Sales (as defined in the Distribution Agreement) of Products and Blue Sky Products for such six month period. Such notice shall indicate whether such Products were sold in the Designated Markets or in the Human Identification Market. Within thirty (30) days after receipt of such report from Perkin-Elmer, Roche shall pay to Perk.1-Elmer Royalties as provided in this Section 2.3. Simultaneously with such payment, Roche shall notify Perkin-Elmer of the Net Revenues Roche received from the sale of Products and Blue Sky Products (other than Products and Blue Sky Products distributed pursuant to the terms of the Distribution Agreement), Related Products, PCR Licenses, Other Market Instruments, and PCR Services and Other Revenues for the applicable six (6) month period.

- 13 -

(e) <u>Payment</u>. All Royalties shall be paid in immediately available U.S. dollars by wire transfer to:

> The Perkin-Elmer Corporation
> Account No. 000-42657
> Citibank, N.A.-New York
> ABA Routing No. 021000089

(f) <u>Records</u>. Roche shall keep and maintain proper and complete records in sufficient detail to verify the calculation of Royalties payable hereunder and the accuracy of the related reports to be made hereunder. Such records shall be retained by Roche for a period of three (3) years from the date of the applicable Royalty payment, and Perkin-Elmer shall have the Right, at its own expense (except as provided below), to have such records reviewed by an independent auditor, certified public accountant or other Person reasonably acceptable to Roche (i) to determine, in respect of any accounting period, the accuracy of any report of payment made under this Agreement or (ii) in the case of Roche's failure to make reports or pay Royalties pursuant to this Section 2.3, to obtain information as to the Royalty payable for any such period. This Right of review shall terminate as to any specific half-yearly payment amount three (3) years after the later of the actual or scheduled receipt of such half-yearly amounts. Said reviewer (A) shall not disclose to Perkin-Elmer any information other than information relating to the accuracy of the reports and Royalty payments made or payable under this Section and in no event are the quantities and prices to individual customers or costs of services or production to be disclosed to Perkin-Elmer by such reviewer and (B) shall, at the request of Roche, execute a confidentiality agreement reasonably acceptable to Roche as a condition to obtaining access to such records. The Royalties due Perkin-Elmer under this Section 2.3 shall be adjusted to reflect all appropriate changes which may be required as a result of any audit undertaken on behalf of Perkin-Elmer in accordance with this subsection. If the review described in this paragraph results in a material adjustment of the Royalties subject to such review, Roche shall reimburse Perkin-Elmer for the costs incurred by Perkin-Elmer in connection with such review.

2.4 <u>Preferred Stock</u>. As partial consideration for the sale of the U.S. Interests contemplated hereby, RPI shall issue to Perkin-Elmer one share of preferred

\*\*

- 14 -

stock, par value $1.00 per share (the "Share"), of RPI, having the terms set forth in Exhibit 2.4 hereto.

2.5 <u>Cetus Instrument Interest</u>. As partial consideration for the sale of the U.S. Interests contemplated hereby, Roche shall sell, assign, transfer, convey and deliver to Perkin-Elmer, and Perkin-Elmer shall purchase and acquire from Roche, the portion of the Cetus Instrument Interest conducted in the United States.

2.6 <u>Restrictions on Transfer of Share</u>. Perkin-Elmer shall not pledge, encumber, transfer or assign the Share (or any interest therein or Right thereunder) to any Person other than an Affiliate of Perkin-Elmer without the prior written consent of Roche.

2.7 <u>Purchase by Roche of Certain Perkin-Elmer Products</u>. Perkin-Elmer agrees to sell to Roche Series TC 9600 Thermocyclers for a purchase price to be agreed by the parties between $6,000 and $9,000 per unit. To the extent that the purchase price paid by Roche for any unit exceeds $6,000, any excess shall be deducted by Roche from the next scheduled Royalty payments due to Perkin-Elmer pursuant to Section 2.3 of this Agreement. Nothing in this Section 2.7 shall be deemed to require Roche to purchase any such Series TC 9600 Thermocyclers from Perkin-Elmer.

2.8 <u>License</u>. Perkin-Elmer hereby grants to Roche and its Affiliates, and Roche and its Affiliates hereby accept, (i) an exclusive, worldwide, royalty-free license under the Light Scattering Molecular Weight Detection Technology and the Liquid Chromotography Technology ("Technologies") to use all such Technologies, for Roche's or its Affiliates' own internal use, to the extent required by or useful to it or them for the design, development, manufacture, use or sale of Products in the Retained Markets and (ii) an exclusive worldwide right, without further payment to Perkin-Elmer, to grant limited, nonexclusive sublicenses under such Technologies to others who are simultaneously being licensed by Roche or an Affiliate of Roche to practice PCR Technology or who have previously been so licensed, in the Retained Markets. Perkin-Elmer reserves all other Rights in these Technologies, including the Right to license others without any accompanying license under PCR Technology. No license under any patent or other proprietary Right of Perkin-Elmer, and no other license, is granted by implication, estoppel or otherwise, by virtue of this Section 2.8.

- 15 -

SECTION 3. CLOSING.

On the terms and subject to the conditions set forth herein, the closing of the transactions contemplated in Sections 2.1, 2.4, and 2.5 hereof (the "Closing") shall take place at the offices of Roche at 10 a.m. on the date the conditions set forth in Sections 9 and 10 have been satisfied, (The date of the Closing is hereafter called the "Closing Date.") In addition, the Distribution Agreement shall be executed and delivered by each of the parties thereto. All transactions contemplated to take place at the Closing shall be deemed to be effective as of 5:00 p.m. Eastern Time on the Closing Date (the "Effective Time").

SECTION 4. REPRESENTATIONS AND WARRANTIES OF PERKIN-ELMER

Perkin-Elmer hereby represents and warrants to Roche and RPI as follows:

4.1 Existence; Authority. (a) Perkin-Elmer is a corporation duly organized, validly existing and in good standing under the laws of the State of New York. Perkin-Elmer has all necessary corporate power and authority to enter into, and be bound by the terms and conditions of, this Agreement and each agreement or instrument contemplated by this Agreement to be executed and delivered by Perkin-Elmer at or prior to Closing ("P-E Related Documents"), to transfer the U.S. Interests to Roche pursuant hereto and to perform all of its obligations under this Agreement and the P-E Related Documents.

(b) PECI is a general partnership duly organized and validly existing under the laws of the State of New York, and has all requisite power and authority under the PECI Agreements and applicable partnership law to carry on its business as it has been and is now being conducted and to own, lease and operate the properties used in connection therewith.

4.2 Due Authority; No Breach. (a) The execution, delivery and performance by Perkin-Elmer of this Agreement and each P-E Related Document and the performance of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Perkin-Elmer. This

Agreement, and each P-E Related Document when executed and delivered by Perkin-Elmer and Roche (and, where applicable, RPI) in accordance with the provisions hereof and thereof, will be a legal, valid and binding obligation of Perkin-Elmer, in each case enforceable against Perkin-Elmer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws from time to time in effect which affect the enforcement of creditors' Rights generally and by limitations on the availability of specific performance and other equitable remedies against Perkin-Elmer. All Persons who have executed this Agreement on behalf of Perkin-Elmer, or who will execute on behalf of Perkin-Elmer any P-E Related Documents, have been, or in the case of any P-E Related Document, prior to the Closing will be, duly authorized to do so by all necessary corporate action.

(b) Neither the execution and delivery by Perkin-Elmer of this Agreement or any P-E Related Document, nor the consummation of the transactions contemplated hereby or thereby, will (i) subject to the execution and delivery of the Termination Agreement, conflict with or result in any violation of or constitute a breach of any of the terms or provisions of, or result in the acceleration of any obligation under, or constitute a default under any provision of the certificate of incorporation or by-laws of Perkin-Elmer or any Contract or Permit to which Perkin-Elmer, the Interests, PECI's Business or PECI's Assets and Property are subject or bound, other than conflicts, breaches, accelerations or defaults which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate the transactions hereby or have a Material Adverse Effect; (ii) except as contemplated by the Acquisition Agreements, result in the creation of any Lien or Other Encumbrance upon the Interests or PECI's Assets and Property pursuant to the terms of any such Contract or Permit or other mortgage, bond, indenture, agreement, franchise or other instrument or obligation other than Liens or Other Encumbrances which, (A) individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate the transactions contemplated hereby or have a Material Adverse Effect, or (B) result from the existence of the PECI Agreement or PECI; (iii) violate any judgment, order, injunction, decree or award of any court, administrative agency, arbitrator or governmental body against or affecting or binding upon, Perkin-Elmer or

PECI, or upon the Interests or the securities or other
assets, properties or businesses of Perkin-Elmer or upon
PECI's Assets or Property or PECI's Business;
(iv) subject to obtaining the approvals set forth in
Section 4.7 hereof, constitute a violation by Perkin-
Elmer or PECI of any law, rule or regulation of any
jurisdiction as such law, rule or regulation relates to
Perkin-Elmer or PECI other than violations which,
individually or in the aggregate, would not materially
impair the ability of the parties hereto to consummate
the transactions contemplated hereby or have a Material
Adverse Effect or (v) require the consent of any Person,
other than (y) consents which, individually or in the
aggregate, would not materially impair the ability of
the parties hereto to consummate the transactions
contemplated hereby or have a Material Adverse Effect or
(z) consents contemplated hereby or by the Termination
Agreement.

4.3  Ownership of Interests.  Subject to the
dissolution of PECI pursuant to the terms of the
Termination Agreement, at the Closing Perkin-Elmer will
have good and marketable title to the Interests, free
and clear of any Lien or Other Encumbrance, other than a
Lien or Other Encumbrance in favor of or imposed by
Roche or FHLR.

4.4  Investment Intent; Sophisticated Investor.
(a)  Perkin-Elmer is acquiring the Share for the
purposes of investment and without a view toward
distribution thereof.  Perkin-Elmer has substantial
business experience and considers itself sophisticated
as to investment matters.  Perkin-Elmer and its agents
and representatives have such knowledge and experience
in business matters so as to enable them to utilize the
information made available in connection with the
transactions contemplated hereby, to evaluate the merits
and risks of such transaction and to make an informed
decision with respect thereto, and such an evaluation
and informed decision has been made.  The foregoing
shall not limit or modify any representations,
warranties, covenants or other agreements made by Roche
or RPI pursuant to this Agreement.

(b) Perkin-Elmer acknowledges that the Share has
not been registered under the Securities Act of 1933, as
amended (the "Act"), or any state securities law
(collectively, "Securities Laws"), that the Share may
not be sold or distributed other than pursuant to (i) an
effective registration statement under the Act or
(ii) Rule 144 and 144A under the Act or (iii) an

- 18 -

exemption from registration under the Act, and that
neither Roche nor RPI has any obligation to register the
Share under any Securities Law or to take any action to
make available any exemption therefrom. Legends to the
foregoing effect shall be set forth on the Share.

    4.5  Financial Statements.  Perkin-Elmer has
furnished Roche with complete copies of the audited
financial statements of PECI for each of the fiscal
years ended June 30, 1988, 1989, and 1990, and the
unaudited financial statements of PECI for the quarterly
periods from June 30, 1990 to March 31, 1991, including
in each case a balance sheet, the related statements of
income and of changes in financial position for the
period then ended, the accompanying notes, and, in
respect to the audited statements, the report thereon of
Price Waterhouse, independent (of Perkin-Elmer)
certified public accountants.  All such financial
statements (i) are true, correct and (except with
respect to unaudited financial statements) complete and
have been prepared in accordance with the books and
records of PECI, (ii)  (with respect only to the audited
financial statements) have been prepared in accordance
with GAAP consistently applied by PECI throughout the
periods indicated, include all known Liabilities of PECI
in accordance with GAAP, including all known contingent
Liabilities as of their respective dates which would be
required to be reflected or disclosed therein in
accordance with GAAP, and (iii) present fairly (in the
case of unaudited financial statements, in all material
respects) the financial condition of PECI at such dates
and the results of the operation of PECI's Business for
the periods then ended.  Except as reflected in the
financial statements or in the Schedules hereto, there
are no known contingent Liabilities of PECI that are
material to PECI's Business or to PECI's Assets and
Property.

    4.6  Litigation.  (a)  Set forth on
Schedule 4.6(a)(i) is a list of all material judicial,
administrative or arbitral Claims pending or overtly
threatened as of the date hereof against Perkin-Elmer,
PECI or any of their Affiliates or Perkin-Elmer's or
PECI's employees, relating to PECI's Business, PECI's
Assets or Property, the Interests, Perkin-Elmer's
execution and delivery of this Agreement or the
consummation of the transactions contemplated hereby or
by any P-E Related Document.  Except only as set forth
on Schedule 4.6(a)(ii), none of the Claims listed on
Schedule 4.6(a)(i), either individually or in the
aggregate, is likely to have a Material Adverse Effect

- 19 -

or materially impair the ability of the parties to consummate the transactions contemplated hereby.

(b)  Except only as set forth on Schedule 4.6(b), there are no pending actions or suits relating to the Interests, PECI's Business, or PECI's Assets and Property brought or threatened by Perkin-Elmer or by PECI against others.

4.7  Governmental Approval.  No consent, approval, waiver, order or authorization of, or registration, declaration or filing with, any governmental authority is required in connection with the execution and delivery of this Agreement by Perkin-Elmer or the consummation by Perkin-Elmer of the transactions contemplated hereby, including without limitation, the transfer of the U.S. Interests, other than (i) any consents and filings required under the HSR Act, and Exon-Florio and the Export Regulations and those consents and filings which may be required by the European Economic Community, or the Federal Republic of Germany or their political subdivisions, (ii) consents, approvals or filings required in connection with the dissolution of PECI, and (iii) consents, approvals, waivers, orders, authorizations or filings which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate such transactions or have a Material Adverse Effect.

4.8  Compliance with Law; Notices.  Except only as set forth on Schedule 4.8(i), neither Perkin-Elmer, nor PECI, nor any of their Affiliates is subject to any applicable judgment, order, injunction, award or decree relating to the Interests, PECI's Business, or PECI's Assets and Property, and neither Perkin-Elmer, nor PECI, nor any of their Affiliates is in violation of any law, ordinance, or governmental rule or regulation which could materially adversely affect (i) the value of or Roche's ability to use the U.S. Interests or (ii) Perkin-Elmer's ability to consummate the transactions contemplated hereby or by any P-E Related Document. Except only as set forth on Schedule 4.8(ii), neither Perkin-Elmer nor PECI has received, and there does not exist, any notice, notification or inquiry that has been provided to Perkin-Elmer or PECI from or by any governmental agency to the effect that Perkin-Elmer or PECI is or may be currently in violation of any law, ordinance, rule, regulation, license, Permit or authorization as it relates to the operation of PECI's Business or the Interests, other than notices, notifications or inquiries which, individually or in the

aggregate, would not have a Material Adverse Effect or
materially impair the ability of the parties hereto to
consummate the transactions contemplated hereby.

4.9  Permits.  PECI is duly licensed under all
laws, regulations, ordinances or orders of public
authorities, or otherwise, to carry on PECI's Business
in the ordinary course of business except with respect
to laws, rules, regulations and orders under which the
failure to be licensed, individually or in the
aggregate, would not have a Material Adverse Effect.
Set forth on Schedule 4.9 is a list of all Permits,
other than Environmental Permits, which PECI has
obtained to operate PECI's Business.  To Perkin-Elmer's
knowledge, no other Permits are necessary or required as
of the date hereof to operate PECI's Business in the
ordinary course of business.  To Perkin-Elmer's
knowledge, all such Permits are in good standing, valid
and effective in accordance with their respective terms,
and there is not any existing default or event which
with notice or lapse of time, or both, would constitute
a default under or in respect of any such Permit and in
respect of which PECI has not taken adequate steps to
prevent a default from occurring, other than defaults or
prospective defaults which if not cured would not,
individually or in the aggregate, have a Material
Adverse Effect.

4.10  Adverse Developments.  Except as disclosed
in Schedule 4.10 hereto, since PECI's Balance Sheet Date
there has not been any material adverse change in PECI's
Business or PECI's Assets and Property, nor has there
been any development or overtly threatened development
of a nature that would have a Materially Adverse Effect,
except as reflected in any financial statements of PECI
subsequent to PECI's Balance Sheet Date that were
delivered to Roche by Perkin-Elmer or Cetus prior to the
date hereof.

4.11  Taxes.  PECI has filed all tax returns
required to be filed by it under the laws of the United
States and each state or other domestic or foreign
jurisdiction in which it conducts business activities.
Except only as set forth on Schedule 4.11 or in PECI's
financial statements, there are no tax Liens or Other
Encumbrances with respect to taxes, whether imposed by
any federal, state, local or foreign taxing authority,
outstanding against PECI or any of its assets, other
than tax Liens or Other Encumbrances which would not,
individually or in the aggregate, have a Material
Adverse Effect.

4.12 <u>Environmental Matters</u>. Except for matters which either individually or in the aggregate would not have a Material Adverse Effect:

(a) PECI has obtained, and now maintains as currently valid and effective, all Environmental Permits required for the operation of PECI's Business, all of which Environmental Permits are listed on Schedule 4.12(a).

(b) PECI is in compliance in all respects with all Environmental Permits and all applicable Environmental Laws, except only as set forth in Schedule 4.12(b).

(c) Prior to the Closing, Perkin-Elmer shall provide to Roche all information in its or its Affiliates' possession relating to PECI's Business regarding (i) alleged noncompliance with any Environmental Laws or Environmental Permits, and (ii) any use or condition of any real property currently or previously owned, occupied, leased, operated, possessed or used by PECI which might give rise to cleanup liability or other obligations under the Environmental Laws.

(d) Perkin-Elmer warrants that, in connection with PECI's operation of PECI's Business, in either case prior to the Closing Date, (i) there has not been any release, discharge or disposal of any Wastes on, at or into the environment surrounding any real property at any time owned, occupied, leased, operated, possessed or used by PECI in violation of any Environmental Laws or Environmental Permits; and (ii) there are no hazardous or other conditions on or at any such real property, including but not limited to soil, groundwater, or surface water contamination, which could in the future require cleanup, response costs, investigative costs or remedial action, or which could give rise to damages to natural resources or personal injuries or be the basis for third-party Claims (including, without limitation, Claims by employees or governmental authorities) under any Environmental Laws, except only as set forth on Schedule 4.12(d).

(e) There are no Environmental Liens or Other Encumbrances on any of the properties owned or leased by PECI in connection with the operation of PECI's Business, and no government actions have been taken or are in process which could subject any of such

properties to such Liens or Other Encumbrances, and PECI
would not be required to place any notice or restriction
relating to the presence of Waste at any property owned
or leased by it in any deed to such property, except
only as set forth on Schedule 4.12(e).

4.13 Contracts. Except for (i) the Termination
Agreement, (ii) agreements made in the ordinary course
of business consistent with past practice or which
relate solely to Retained Interests and (iii) agreements
set forth on Schedule 4.13, neither PECI nor PECI's
Assets and Property is subject to or bound by any
written or oral:

(a) agreement, contract, commitment or other
arrangement requiring any payment of $25,000 or more or
which is not terminable without cost to Roche within
30 days;

(b) agreement, contract or commitment to
sell or supply products involving in any one case
$25,000 or more in value or which is not terminable
without cost to Roche within 30 days;

(c) agreement, contract, commitment or
arrangement with any labor union or other representative
of employees;

(d) material agreement or contract not made
in the ordinary course of business;

(e) agreement, contract or commitment of or
any capital expenditure in excess of $50,000; or

(f) agreement, contract, commitment or
arrangement which limits, or purports to limit, the
ability of PECI to compete or operate anywhere in the
world or the operation of PECI's business.

4.14 PECI Agreement. Perkin-Elmer has delivered
to Roche a true, complete and correct copy of the PECI
Agreement.

4.15 Ordinary Course. Since March 31, 1991,
PECI has conducted PECI's Business in the ordinary
course and has not incurred any material fixed
Liabilities outside the ordinary course of its business.

4.16 Limitation. Notwithstanding any other
provision of this Agreement, Perkin-Elmer makes no
representation or warranty with respect to any matter
whatsoever relating to (i) any patents of PECI or Cetus

that do not relate to instruments or (ii) the environment, Environmental Laws or the presence or use of any Wastes or hazardous substances on, under or from properties owned or leased or previously owned or leased by Cetus in the State of California. No event or fact disclosed to Roche or FHLR in any Schedule to any of the Acquisition Agreements or the Cetus Agreements or of which Roche or FHLR has actual Knowledge prior to the Closing shall form the basis of a claim of breach of any representation or warranty of Perkin-Elmer hereunder.

SECTION 5.   REPRESENTATIONS AND WARRANTIES OF ROCHE

          Roche hereby represents and warrants to Perkin-Elmer as follows:

          5.1  Corporate Existence; Authority.  Roche is duly organized, validly existing and in good standing under the laws of the State of New Jersey.  Roche has all necessary corporate power and authority to enter into, and be bound by the terms and conditions of, this Agreement and each agreement or instrument contemplated by this Agreement to be executed and delivered by Roche at or prior to the Closing ("Roche Related Documents"), to acquire the U.S. Interests to be acquired from Perkin-Elmer pursuant hereto, to assume the U.S. Assumed Liabilities and to perform all of its obligations under this Agreement and the Roche Related Documents.

          5.2  Due Authority.  The execution, delivery and performance by Roche of this Agreement and each Roche Related Document and the performance of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Roche.  This Agreement, and each Roche Related Document, when executed and delivered by Roche and Perkin-Elmer in accordance with the provisions hereof and thereof, will be a legal, valid and binding obligation of Roche, in each case enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws from time to time in effect which affect the enforcement of creditors' Rights generally and by limitations on the availability of specific performance and other equitable remedies against Roche.  All Persons who have executed this Agreement on behalf of Roche, or who will execute on behalf of Roche any Roche Related Document, have been,

\* \*

- 24 -

or in the case of a Roche Related Document prior to the Closing will be, duly authorized to do so by all necessary corporate action.

5.3 <u>No Breach</u>. Neither the execution and delivery by Roche of this Agreement or any Roche Related Document, nor the consummation of the transactions contemplated hereby or thereby, will (i) conflict with or result in any violation of or constitute a breach of any of the terms or provisions of, or result in the acceleration of any obligation under, or constitute a default under any provision of the certificate of incorporation or by-laws of Roche or any Contract or Permit of Roche, to which Roche is a party or to which it is or any of its assets or properties are subject or bound, other than conflicts, breaches, accelerations or defaults which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate the transactions contemplated hereby; (ii) result in the creation of any Lien or Other Encumbrance upon any of its assets or property pursuant to the terms of any such Contract or Permit, other than Liens or Other Encumbrances which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate the transactions contemplated hereby; (iii) violate any judgment, order, injunction, decree or award of any court, administrative agency, arbitrator or governmental body against or affecting or binding upon, Roche, any of its assets or upon the securities or other properties or businesses of Roche; (iv) constitute a violation by Roche of any law, rule or regulation of any jurisdiction as such law, rule or regulation relates to Roche or any of its assets, other than violations which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate the transaction contemplated hereby; or (v) require the consent of any Person.

5.4 <u>Litigation</u>. No material judicial, administrative or arbitral Claims are pending or overtly threatened as of the date hereof against Roche or any of its Affiliates or its employees relating to Roche's execution and delivery of this Agreement or any Roche Related Document or the consummation of the transactions contemplated hereby or thereby.

5.5 <u>Government Approval</u>. No authorization, approval or consent, and no registration or filing with any governmental or regulatory official, body or authority is required in connection with the execution,

\*\*

- 25 -

delivery and performance of this Agreement by Roche, except for (i) any consents and filings required under the HSR Act or Exon-Florio and the Export Regulations and those consents and filings which may be required by the European Economic Community, the Federal Republic of Germany or their political subdivisions and (ii) consents, approvals, waivers, orders, authorizations or filings which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate such transactions.

5.6  Information Accurate.  Attached hereto as Exhibit 5.6 are true and correct excerpts from the Cetus Agreements which describe the assets of Cetus to be acquired by Roche and FHLR, respectively, and certain representations with respect to the transfer thereof to Roche and FHLR, respectively, pursuant to the Cetus Agreements.

## SECTION 6.  REPRESENTATIONS AND WARRANTIES OF RPI

RPI hereby represents and warrants to Perkin-Elmer as follows:

6.1  Corporate Existence; Authority.  RPI is duly organized, validly existing and in good standing under the laws of the State of Delaware.  RPI has all necessary corporate power and authority to enter into, and be bound by the terms and conditions of, this Agreement applicable to it.

6.2  Due Authority.  The execution, delivery and performance by RPI of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on the part of RPI. This Agreement is a legal, valid and binding obligation of RPI, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws from time to time in effect which affect the enforcement of creditors' Rights generally and by limitations on the availability of specific performance and other equitable remedies against RPI.  All Persons who have executed this Agreement on behalf of RPI have been duly authorized to do so by all necessary corporate action.

\*\*

6.3 <u>No Breach</u>. Neither the execution and delivery by RPI of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) conflict with or result in any violation of or constitute a breach of any of the terms or provisions of, or result in the acceleration of any obligation under, or constitute a default under any provision of the certificate of incorporation or by-laws of RPI or any Contract or Permit of RPI, to which RPI is a party or to which it is or any of its assets or properties are subject or bound, other than Liens or Other Encumbrances which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate the transactions contemplated hereby or have a Material Adverse Effect; (ii) result in the creation of any Lien or Other Encumbrance upon any of its assets or property pursuant to the terms of any such Contract or Permit, other than Liens or Other Encumbrances which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate the transactions contemplated hereby; (iii) violate any judgment, order, injunction, decree or award of any court, administrative agency, arbitrator or governmental body against or affecting or binding upon, RPI, any of its assets or upon the securities or other properties or businesses of RPI; or (iv) constitute a violation by RPI of any law, rule or regulation of any jurisdiction as such law, rule or regulation relates to RPI or any of its assets, other than Liens or Other Encumbrances which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate the transactions contemplated hereby or have a Material Adverse Effect.

6.4 <u>Governmental Approval</u>. No authorization, approval or consent, and no registration or filing with any governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement by RPI, except for (i) any consents and filings required under the HSR Act or Exon-Florio and the Export Regulations and those consents and filings which may be required by the European Economic Community and the Federal Republic of Germany or their political subdivisions and (ii) consents, approvals, waivers, orders, authorizations or filings which, individually or in the aggregate, would not materially impair the ability of the parties hereto to consummate such transactions.

\*\*

6.5 Share Validly Issued. The Share to be issued and delivered to Perkin-Elmer at Closing pursuant to Section 2.4 hereof, upon issuance and delivery thereof, will be duly authorized, validly issued, fully paid and nonassessable.

SECTION 7. COVENANTS OF PERKIN-ELMER

Perkin-Elmer hereby covenants and agrees as follows:

7.1 Operation of PECI. Until the Closing or the earlier termination of this Agreement pursuant to Section 12 hereof, Perkin-Elmer shall not, without first obtaining the written consent of Roche (which consent shall not be unreasonably withheld) or except as required to effect the dissolution of PECI as provided in the Termination Agreement, authorize PECI to:

(a) Place any Lien or Other Encumbrance on any of PECI's Assets and Property, except in the ordinary course of business, consistent with past practice;

(b) Enter into any Contract with respect to PECI's Business or PECI's Assets and Property (i) which cannot be performed within three months or less, or (ii) which involves the expenditure of over $25,000, except for sales and purchase contracts entered into in the ordinary course of business, consistent with past practice;

(c) Extend credit to customers in PECI's Business departing from the normal and customary trade, discount and credit policies of PECI in the ordinary course of business, consistent with past practice; or

(d) Operate PECI's Business other than in the ordinary course consistent with past practice except as contemplated hereby.

7.2 Exclusivity. Except with the prior written consent of Roche, from and after the date hereof and until the Closing or earlier termination of this Agreement in accordance with Section 12 hereof, Perkin-Elmer shall not, directly or indirectly, solicit, encourage or facilitate (nor shall Perkin-Elmer permit (in the case of its Affiliates or its or their officers,

directors or employees) or authorize (in the case of its
or its Affiliates' investment bankers, financial
advisors, attorneys, accountants or other
representatives or agents) any of them, directly or
indirectly, to solicit, encourage or facilitate) any
inquiries or proposals with respect to, or participate
in any negotiations or discussions concerning, any sale,
transfer, assignment, pledge or conveyance of the
Interests or any other transaction which could
materially and adversely affect Perkin-Elmer's ability
to consummate the transactions contemplated hereby.
Perkin-Elmer shall promptly notify Roche orally (to be
confirmed in writing as soon as practicable thereafter)
if any such inquiries or proposals are received by, any
such information is required from, or any such
negotiations or discussions are sought to be initiated
by Perkin-Elmer. The sale of all or substantially all
the stock or assets of Perkin-Elmer to a third party
shall not be deemed to be a sale, transfer, assignment,
pledge or conveyance of the Interests for purposes of
this Section 7.2, provided that such third party agrees
to be bound by the terms and conditions of this
Agreement.

7.3 _Litigation During Interim Period_. Until the
Closing or the earlier termination of this Agreement
pursuant to Section 12 hereof, Perkin-Elmer shall not,
without the prior written consent of Roche, which
consent shall not be unreasonably withheld, initiate, or
consent to the initiation by PECI or any Affiliate of
Perkin-Elmer of, any litigation, arbitration, mediation,
or other proceeding relating or in any way connected to
or arising out of the operation of PECI's Business.
Such prior written consent shall not be required for
Perkin-Elmer to initiate, or consent to the initiation
of, any temporary restraining order, preliminary
injunction or other similar proceeding which
Perkin-Elmer in good faith believes is necessary to
protect a material Right of PECI, Perkin-Elmer or any
Affiliate of Perkin-Elmer and where, due to the nature
of such proceeding, the delay in initiating such
proceeding that would be caused by obtaining Roche's
prior consent therefor would likely have an adverse
impact on the ability of PECI, Perkin-Elmer or any of
Perkin-Elmer's Affiliates to prevail in such proceeding,
_provided_ that Perkin-Elmer shall promptly notify Roche
orally (to be confirmed in writing as soon as
practicable thereafter) that it has initiated, or
consented to the initiation of, such a proceeding.

7.4 <u>Reports</u>. Until the Closing or earlier termination of this Agreement pursuant to Section 12 hereof, Perkin-Elmer shall provide Roche with such financial and other reports relating to PECI as Roche reasonably may request to the extent such reports are in Perkin-Elmer's possession or under its control; provided, however, that Perkin-Elmer shall not be required to provide Roche any of the foregoing to the extent that Perkin-Elmer is precluded from doing so pursuant to the provisions of a valid and binding confidentiality agreement between Perkin-Elmer and a Person that is not an Affiliate of Perkin-Elmer or is otherwise precluded by law.

7.5 <u>Access</u>. Perkin-Elmer shall consent to any request by Roche to give to Roche's officers, employees, counsel, accountants and other representatives free and full access to and the Right to inspect, during normal business hours, PECI's premises, properties, assets, records, Contracts and other documents (other than privileged communications) relating to PECI's Business or PECI's Assets and Property, and, subject to Cetus' consent, shall permit them to consult with the officers, employees, accountants, counsel and agents of Perkin-Elmer and PECI for the purpose of making such investigation of PECI's Business and PECI's Assets and Property as Roche shall reasonably desire to make, provided that such investigation shall not unreasonably interfere with the operations of Perkin-Elmer's or PECI's Business; and provided further, that Perkin-Elmer shall not be required to give Roche access to any of the foregoing to the extent that such access is precluded pursuant to the provisions of a valid and binding confidentiality agreement between Perkin-Elmer, or PECI, and a Person that is not an Affiliate of Perkin-Elmer or is otherwise precluded by law. Furthermore, Perkin-Elmer shall make available to Roche all such documents and copies of such documents and records as Roche shall from time to time reasonably request to the extent Roche is permitted access to such documents and records pursuant to this Section 7.5.

7.6 <u>Representations and Warranties</u>. Perkin-Elmer promptly shall notify Roche in writing (i) if any information set forth in any of Perkin-Elmer's representations or warranties contained herein is no longer correct in any material respect, (ii) if Perkin-Elmer becomes aware that any of Perkin-Elmer's representations or warranties were incorrect in any material respect when made, or (iii) of any information of the nature of that set forth in such representations

\*\*

or warranties which arises after the date hereof and which would have been required to be included therein or in the Schedules hereto if such information had been obtained or had been in existence on the date hereof.

7.7  Actions with Respect to Closing.  Perkin-Elmer shall use its best efforts to bring about the satisfaction of the conditions precedent to the Closing contained in Section 9 and to cause the covenants and agreements of Perkin-Elmer contained in Section 7 to be satisfied and performed by it.  Within thirty (30) days hereof, Perkin-Elmer shall make its required filings under the HSR Act.

7.8  Access to Records.  Perkin-Elmer shall, in connection with the preparation by Roche of tax and financial reporting matters and other bona fide business purposes, for a period of five (5) years from the Closing Date afford to Roche and its representatives the opportunity, upon reasonable advance notice, to examine and make copies of the books and records of PECI maintained by Perkin-Elmer for any period prior to the Closing, except to the extent that such access is precluded pursuant to the provisions of a valid and binding confidentiality agreement between Perkin-Elmer and a Person who is not an Affiliate of Perkin-Elmer or is otherwise precluded by law, and shall maintain such records for a period of five (5) years from the date hereof.

7.9  No Solicitation.  For a period of five years from the date hereof, Perkin-Elmer shall not solicit any employees of Roche or its Affiliates whose employment relates to polymerase chain reaction technology or nucleic acid amplification technology, provided that general advertisements or solicitations not specifically directed to employees of Roche or its Affiliates shall not be prohibited.

SECTION 8.  COVENANTS OF ROCHE and RPI.

Roche and RPI hereby covenant and agree as follows:

8.1  Actions with Respect to Closing.  Each of Roche and RPI shall use its best efforts to bring about the satisfaction of the conditions precedent to the Closing contained in Section 10 and to cause the covenants and agreements contained in Section 8 to be

\*\*

- 31 -

satisfied and performed by it. Within thirty (30) days
hereof, Roche shall make its required filings under the
HSR Act.

8.2 <u>Representations and Warranties</u>. Roche
promptly shall notify Perkin-Elmer in writing (i) if any
information set forth in any of Roche's or RPI's
representations or warranties contained herein is no
longer correct, (ii) if Roche becomes aware that any of
its or RPI's representations or warranties were
incorrect in any material respect when made, and
(iii) of any information of the nature of that set forth
in Roche's or RPI's representations or warranties which
arises after the date hereof and which would have been
required to be included therein or in the Schedules
hereto if such information had been obtained or had been
in existence on the date hereof.

8.3 <u>Cetus Agreements</u>. Roche shall use its best
efforts to bring about the consummation of the
transactions contemplated by the Cetus Agreements,
including without limitation the transfer by Cetus to
Roche of the U.S. interests of Cetus arising from PECI
or the PECI Agreement as contemplated by the U.S. Cetus
Agreement; <u>provided</u>, that nothing in this Section 8.3
shall be construed to require Roche to waive any
condition, the performance of any covenant or any breach
of the Cetus Agreements or to agree to any amendment
thereto.

8.4 <u>Use of Name</u>. As soon as practicable but in
no event more than one (1) year following the Effective
Time, Roche, and its Affiliates will cease using the
name "Perkin-Elmer" in connection with the products
manufactured by them except as otherwise provided in the
Distribution Agreement.

8.5 <u>Taxes</u>. Roche shall be responsible for any
and all sales, use or other transfer taxes payable in
connection with the transfer and assignment of the
Interests by Perkin-Elmer to Roche. Roche and Perkin-
Elmer shall cooperate in filing any forms required to be
filed with respect to the determination and payment of
taxes described in the preceding sentence.

8.6 <u>No Solicitation</u>. For a period of five (5)
years from the date hereof, Roche shall not solicit any
employees of Perkin-Elmer or its Affiliates whose
employment relates to polymerase chain reaction
technology or nucleic acid amplification technology,
provided that general advertisements or solicitations

9.1 <u>Representations and Warranties True as of the Closing Date</u>. The representations and warranties of Perkin-Elmer contained in this Agreement, as limited by Section 4.16 hereof, shall be true on the Closing Date in all material respects with the same effect as though such representations and warranties were made on and as of such date, except for any changes that arise solely by virtue of the dissolution and liquidation of PECI contemplated by Section 9.7 hereof.

9.2 <u>Compliance with this Agreement</u>. Perkin-Elmer shall have performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by Perkin-Elmer prior to or at the Closing.

9.3 <u>Closing Documents</u>. Perkin-Elmer shall have prepared to the reasonable satisfaction of Roche and its counsel and delivered to Roche each of the following documents:

(a) an assignment of the U.S. Interests in form and substance satisfactory to Roche and its counsel;

(b) an opinion of C. Wendell Bergere, Jr., Vice President and General Counsel to Perkin-Elmer, as to the matters set forth in Exhibit 9.3(b) and dated as of the Closing Date;

(c) an incumbency certificate for Perkin-Elmer dated as of the Closing Date, including specimen signatures;

(d) a certificate executed on behalf of Perkin-Elmer by its Chairman of the Board, President, Treasurer or a Vice President, and Secretary or Assistant Secretary, dated the Closing Date, representing and certifying, in such detail as Roche reasonably may request, that the conditions set forth in this Section 9 have been fulfilled at or prior to the Closing Date; and

(e) a copy of all of the resolutions adopted by Perkin-Elmer's board of directors or any committee thereof relating to the transactions contemplated by this Agreement, certified on the Closing Date to be complete and correct by the Secretary or an Assistant Secretary of Perkin-Elmer.

\*\*

9.4  <u>No Threatened or Pending Litigation</u>.  On the
Closing Date, no suit, action, arbitration or other
proceeding, or injunction or final judgment relating
thereto, shall be overtly threatened or be pending
before any court or governmental or regulatory official,
or any other body or authority in which any governmental
agency seeks to restrain or prohibit the consummation of
the transactions contemplated hereby or by any P-E
Related Document.

9.5  <u>Cetus Agreements and Non-U.S. Acquisition
Agreement</u>.  The transactions contemplated by the Cetus
Agreements and the Non-U.S. Acquisition Agreement shall
have been consummated prior to or simultaneously with
the transactions contemplated hereby.

9.6  <u>Regulatory Approvals</u>.  All required
regulatory consents and approvals shall have been
obtained, all other requirements prescribed by law which
are necessary to the consummation of the transactions
contemplated hereby, by any P-E Related Document and by
the Cetus Agreements shall have been obtained, and all
statutory waiting periods in respect thereof shall have
expired.

9.7  <u>Dissolution of PECI</u>.  PECI shall have been
dissolved prior to the Closing and the PECI Agreements
shall have been terminated at or prior to the Closing,
all in accordance with the Termination Agreement or
otherwise in a manner satisfactory in form and substance
to Roche and its counsel.

SECTION 10.   CONDITIONS PRECEDENT TO
             PERKIN-ELMER'S OBLIGATIONS

All obligations of Perkin-Elmer under this
Agreement are subject to the fulfillment or
satisfaction, prior to or at the Closing, of each of the
following conditions precedent:

10.1  <u>Representations and Warranties True as of
the Closing Date</u>.  The representations and warranties of
Roche and RPI contained in this Agreement shall be true
on the Closing Date in all material respects with the
same effect as though such representations and
warranties were made on and as of such date.

\*\*

- 35 -

10.2 <u>Compliance with this Agreement</u>. Roche and RPI shall have performed and complied with all material agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

10.3 <u>Closing Documents</u>. Roche and RPI shall have prepared to the reasonable satisfaction of Perkin-Elmer and its counsel and shall have delivered to Perkin-Elmer each of the following documents:

(a) an assignment of the Cetus Instrument Interest in form and substance satisfactory to Perkin-Elmer and its counsel;

(b) a certificate representing the Share executed by a duly authorized officer of RPI; —

(c) an opinion of Harold P. Boardman, General Counsel to Roche, as to the matters set forth in Exhibit 10.3(a) hereto and dated the Closing Date;

(d) incumbency certificates for Roche and RPI, dated the Closing Date, including specimen signatures;

(e) a certificate executed on behalf of each of Roche and RPI by its Chairman of the Board, President, Treasurer or a Vice President, and Secretary or Assistant Secretary, dated the Closing Date, representing and certifying, in such detail as Perkin-Elmer reasonably may request, that the conditions set forth in this Section 10 have been fulfilled at or prior to the Closing Date; and

(f) copies of all of the resolutions adopted by Roche's and RPI's boards of directors relating to the Transactions Contemplated by this Agreement, certified on the Closing Date to be complete and correct by the Secretaries or Assistant Secretaries thereof.

10.4 <u>Threatened or Pending Litigation</u>. On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be overtly threatened or be pending before any court or governmental or regulatory official, body or authority in which any governmental agency seeks to restrain or prohibit the consummation of the transactions contemplated hereby or by any Roche Related Document.

**

10.5 <u>Cetus Consent</u>. Cetus shall have consented in writing to the transfer by Perkin-Elmer to Roche of the U.S. Interests.

10.6 <u>Regulatory Approvals</u>. All required regulatory consents and approvals shall have been obtained, all other requirements prescribed by law which are necessary to the consummation of the transactions contemplated hereby, by any Roche Related Document and by the Cetus Agreement shall have been obtained, and all statutory waiting periods in respect thereof shall have expired.

10.7 <u>Dissolution of PECI</u>. The PECI Agreement shall have been terminated and PECI dissolved in accordance with the terms of the Termination Agreement.

10.8 <u>Cetus Agreement and Non-U.S. Acquisition Agreement</u>. The transactions contemplated by the Cetus Agreement and the Non-U.S. Acquisition Agreement shall have been consummated prior to or simultaneously with the Transactions Contemplated Hereby.

SECTION 11. <u>INDEMNIFICATION; SURVIVAL</u>.

11.1 <u>Perkin-Elmer Indemnity</u>. Subject to Section 11.4 hereof, Perkin-Elmer shall indemnify and hold harmless Roche and its Affiliates and their respective directors, officers, employees and agents from and against any losses, claims, Liabilities, damages or expenses (including reasonable attorneys' fees) (collectively, "Losses") arising out of, relating to or resulting from:

(a) Unassumed Liabilities, other than those within the scope of subsections (d), (e) and (f) of Section 11.1 hereof, and only to the extent of fifty-one (51) percent of any Losses therefor ("Covered Losses") and only to the extent that the aggregate amount of such Covered Losses paid directly by Perkin-Elmer or in reimbursement of Roche and FHLR pursuant to the Acquisition Agreements do not exceed $16,000,000 (the "Maximum Amount");

(b) any breach of any representation or warranty of Perkin-Elmer contained in this Agreement or any P-E Related Document that survives at the time such indemnification is first sought;

(c) any breach of any of Perkin-Elmer's covenants contained herein;

\*\*

- 32 -

not specifically directed to employees of Perkin-Elmer or its Affiliates shall not be prohibited.

8.7 <u>Roche Certificate</u>. Immediately prior to the Closing, if Roche, in its sole discretion, determines that all of the conditions precedent to Roche's and RPI's obligations set forth in Section 9 (other than the dissolution of PECI or any condition the satisfaction of which is dependent only upon such dissolution) hereof have been met, Roche shall provide a certificate signed by a duly authorized officer of Roche to Perkin-Elmer and Cetus to such effect. Nothing set forth in such certificate nor the provision of the same to Perkin-Elmer and Cetus (i) shall be deemed to constitute a waiver by Roche or RPI of any of its Rights hereunder or (ii) shall establish that such conditions precedent have actually been met.

8.8 <u>Compliance with Applicable Laws</u>. Following the Closing, Roche will comply in all material respects with all applicable statutes, laws, ordinances, rules and regulations of any governmental authority as they relate to its PCR Technology and NA Amplification Technology business, including, without limitation, Environmental Laws.

8.9 <u>Access to Records</u>. Roche shall, in connection with the preparation by Perkin-Elmer of tax and financial reporting matters and other bona fide business purposes, for a period of five (5) years from the Closing Date afford to Perkin-Elmer and its representatives the opportunity, upon reasonable advance notice, to examine and make copies of the books and records of PECI maintained by Roche for any period prior to the Closing, except to the extent that such access is precluded pursuant to the provisions of a valid and binding confidentiality agreement between Roche and a Person who is not an Affiliate of Roche or is otherwise precluded by law, and shall maintain such records for a period of five (5) years from the date hereof.

SECTION 9.   CONDITIONS PRECEDENT TO ROCHE'S
            AND RPI'S OBLIGATIONS.

All obligations of Roche and RPI under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

\*\*

- 37 -

(d)  Environmental Liabilities, including any such Liabilities which are Unassumed Liabilities and without regard to the Maximum Amount and without regard to whether any such Losses are Covered Losses, in connection with the operation by PERKIN-ELMER or PECI of PECI's Business or PECI's Assets and Property, if any, in the State of Connecticut or the Commonwealth of Puerto Rico, that arise prior to the Closing whether such Liability is asserted before or after the Closing;

(e)  all Liabilities, relating to or arising out of the Cetus Instrument Interests, including any such Liabilities which are Unassumed Liabilities and without regard to the Maximum Amount and without regard to whether any such Losses are Covered Losses; and

(f)  all Liabilities that relate to or arise from a violation or alleged violation by PECI of the antitrust or fair trade laws included in Unassumed Liabilities (but not any Liability that was assumed by Roche pursuant to the Cetus Agreements) without regard to the Maximum Amount and without regard to whether any such Losses are Covered Losses.

11.2  Roche Indemnity.  Subject to Section 11.4, Roche shall indemnify and hold harmless Perkin-Elmer and its Affiliates and their respective directors, officers, employees and agents from and against any Losses arising out of, relating to or resulting from:

(a)  Liabilities arising subsequent to the Closing out of or relating to the ownership of, and the conduct of the business involving, the U.S. Interests, or any assets acquired pursuant to the U.S. Cetus Agreement (other than the Cetus Instrument Interests);

(b)  any breach of any representation or warranty of Roche or RPI contained in this Agreement or in any Roche Related Document that survives at the time such indemnification is first sought;

(c)  any breach of any of Roche's or RPI's covenants contained herein;

(d)  the U.S. Assumed Liabilities;

(e)  Environmental Liabilities, including any such Liabilities that are Unassumed Liabilities and without regard to the threshold set forth in Section 11.2(g) hereof and without regard to

\*\*

- 38 -

Section 11.2(h) hereof, whether arising or asserted prior to or after the Closing, in connection with the facilities or manufacturing business of PECI or Cetus (but in the case of Cetus only to the extent that such Liabilities relate to or arise from the ownership or operation of the polymerase chain reaction business) located in the State of California, but only after all reasonable efforts are pursued by Perkin-Elmer to collect from Cetus, its Affiliates, successors or insurers any Losses arising out of or resulting from such Environmental Liabilities and then only to the extent of fifty (50) percent of such Losses incurred by Roche and its Affiliates and Perkin-Elmer and its Affiliates that are not in fact paid (including by way of reimbursement) by or on behalf of Cetus, its Affiliates, successors or insurers;

(f) Liabilities, including any such Liabilities that are Unassumed Liabilities and without regard to the threshold set forth in Section 11.2(g) hereof, and without regard to Section 11.2(h) hereof, relating to patents of Cetus or PECI that do not relate to instruments;

(g) Covered Losses only to the extent that the aggregate of Covered Losses paid directly by Perkin-Elmer or in reimbursement of Roche and FHLR pursuant to Section 11.1(a) hereof exceed the Maximum Amount; and

(h) Unassumed Liabilities that are not Covered Losses but only to the extent of fifty (50) percent thereof, but excluding any such Liabilities that are within the scope of subsections (d), (e) or (f) of Section 11.1 hereof.

11.3 Notice Regarding Indemnities, Limitation of Indemnity, Etc. (a) If a Person indemnified pursuant to Section 11.1 or 11.2 (an "Indemnified Party") has suffered or incurred any Loss for which indemnification is provided hereunder, it promptly shall give notice to the party from whom indemnification is sought for such Loss pursuant to Section 11.1 or 11.2 (the "Indemnifying Party"), in writing, describing in reasonable detail the facts and circumstances giving rise to the claim for indemnification, including the amount of Losses, the method of computation of such Losses, and the provisions of this Agreement relating to such claim for indemnification; provided that in the case of a Claim for indemnification based on Section 11.2(e), such

**

notice shall be provided promptly after Perkin-Elmer
first asserts a Claim against Cetus, its Affiliate,
successor or insurer. The failure of an Indemnified
Party to give notice in the manner provided herein shall
not relieve the Indemnifying Party of its obligations
under this Section, except to the extent that the
Indemnifying Party actually is prejudiced by such
failure to give notice. Upon receipt of a notice of a
claim for indemnification, the Indemnifying Party shall
promptly pay to the Indemnified Party the amount of such
damages in accordance with and subject to the provisions
of this Section; provided, however, that no such payment
shall be due during any period in which the Indemnifying
Party is contesting in good faith either its obligation
to make such indemnification or the amount of damages
payable, or both.

(b) Each of Roche (for purposes of Section
11.1(a)) and Perkin-Elmer (for purposes of subsections
(g) and (h) of Section 11.2) shall be obligated to
pursue reasonable efforts to seek payment of any Losses
by any third party pursuant to any applicable
indemnification, insurance policy or otherwise before
being entitled to collect under any of the
indemnification provisions referred to in this sentence.
For purposes of subsections (d) and (f) of Section 11.1,
Roche shall be obligated to pursue reasonable efforts to
seek payment of any Losses from Cetus, pursuant to any
applicable indemnification provision of the Cetus
Agreements, before being entitled to collect under any
of the indemnification provisions referred to in this
sentence. For purposes of this Section 11.3(b), amounts
paid by Perkin-Elmer or Roche shall not be deemed to
include amounts for which they are reimbursed or
indemnified by an insurer or other third party.

11.4 <u>Limitation on Recoveries</u>. Notwithstanding
anything to the contrary contained herein,

(a) no Claim for Losses shall be enforced
against an Indemnifying Party to the extent any
insurance proceeds or other recoveries actually are
received by the Indemnified Party with respect to any
Losses otherwise payable by the Indemnifying Party; and

(b) Perkin-Elmer shall have no obligation to
indemnify Roche or any other Indemnified Party for any
Losses that arise out of or result from (i) any
Environmental Liabilities, whether arising or asserted
prior to or after the Closing, that arise in connection
with the facilities or manufacturing business of Cetus

\*\*

- 40 -

or PECI located in the State of California or (ii) any
Liabilities relating to patents of Cetus or PECI that do
not relate to instruments.

11.5 <u>Survival</u>. The representations and
warranties of the parties hereto contained in this
Agreement shall survive the Closing until three (3)
years after the Closing except that the representations
and warranties contained in Sections 4.1, 4.2(a), 4.3,
4.7, 4.14, 5.1, 5.2, 5.5, 6.1, 6.2, 6.4 and 6.5 shall
survive forever.


SECTION 12.  <u>TERMINATION</u>.

12.1 <u>Termination</u>. This Agreement may be
terminated or abandoned at any time before the Closing
Date:

(a) by mutual written consent of Perkin-
Elmer and Roche;

(b) by Roche, if there has been a material
breach by Perkin-Elmer of any of its representations,
warranties or covenants set forth herein; <u>provided,
however</u>, that Roche shall not be entitled to exercise
its Right to terminate this Agreement if such
misrepresentation or breach reasonably is susceptible of
cure by December 31, 1991 and Perkin-Elmer promptly
institutes efforts to cure such misrepresentation or
breach and diligently prosecutes such cure to
completion;

(c) by Perkin-Elmer, if there has been a
material breach by Roche or RPI of any of the
representations, warranties or covenants of Roche or RPI
set forth herein; <u>provided</u>, <u>however</u>, that Perkin-Elmer
shall not be entitled to exercise its Right to terminate
this Agreement if such breach reasonably is susceptible
of cure by December 31, 1991 and Roche or RPI, as the
case may be, promptly institutes efforts to cure such
misrepresentation or breach and diligently prosecutes
such cure to completion;

(d) by Roche, if there has been a material
breach by Perkin-Elmer of its covenants set forth in
Section 7.2;

(e) by either Perkin-Elmer or Roche if the
Closing Date shall not have occurred on or before
December 31, 1991 (unless extended to March 31, 1992 in

\*\*

$- 41 -$

accordance with the terms of the Cetus Agreements) for any reason other than the failure of the party seeking to terminate this Agreement to perform its obligations hereunder or because of a breach of such party's representations or warranties hereunder; or

(f) by either Perkin-Elmer or Roche if the Cetus Agreements are terminated.

12.2 Effects of Termination. Any election to terminate this Agreement pursuant to the provisions of this Section 12 shall affect neither party's available remedies at law or in equity.

SECTION 13. MISCELLANEOUS.

13.1 Entire Agreement; Amendment. This Agreement, the Exhibits and Schedules appended hereto, the P.E. Related Documents, the Roche Related Documents and the Non-U.S. Agreement and the Exhibits and Schedules appended thereto embody and constitute the entire understanding between the parties with respect to the transactions contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement. Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

13.2 Notices. All notices, demands, requests, or other communications which may be or are required to be given, served or sent by either party to the other party pursuant to this Agreement, shall be in writing and shall be hand delivered, sent by express mail or other overnight delivery service or mailed by registered or certified mail, return receipt requested, postage prepaid, or transmitted by telegram, telex or telecopy, addressed as follows:

(i) If to Perkin-Elmer:

The Perkin-Elmer Corporation
761 Main Avenue
Norwalk, CT 06850
Telecopier No. (203) 834-6000
Attn: President, Instruments

\*\*

- 42 -

with a copy (which shall not constitute
notice) to its counsel:

Alexandra D. Korry
Sullivan & Cromwell
125 Broad Street
New York, New York 10004
Telecopier No. (212) 883-1186

(ii)  If to Roche or RPI:

Hoffmann-La Roche Inc.
340 Kingsland Street
Nutley, NJ  07110
Telecopier No. (201) 235-3500
Attn:  General Counsel

with a copy (which shall not constitute —
notice) to its counsel:

Robert H. Winter, Esq.
Arnold & Porter
1200 New Hampshire Ave., N.W.
Washington, D.C.  20036
Telecopier No. (202) 872-6720

Each party may designate by notice in writing a new
address (or substitute or additional Persons) to which
any notice, demand, request or communication may
thereafter be so given, served or sent.  Each notice,
demand, request, or communication which shall be mailed,
sent, delivered, telefaxed or telexed in the manner
described above, or which shall be delivered to a
telegraph company, shall be deemed sufficiently given,
served, sent or received for all purposes at such time
as it is delivered to the addressee (with the return
receipt, the delivery receipt or, with respect to a
telex or telefax, the answerback being deemed conclusive
evidence of such delivery) or at such time as delivery
is refused by the addressee upon presentation.

13.3  Governing Law.  This Agreement shall be
governed by, and construed in accordance with, the laws
of the State of New York, without giving effect to the
conflicts of laws provisions thereof.

13.4  Captions.  The captions in this Agreement
are inserted for convenience of reference only and in no
way define, describe or limit the scope or intent of
this Agreement or any of the provisions hereof.

**

- 43 -

13.5 <u>Benefit; No Third Party Beneficiaries</u>.
This Agreement shall be binding upon and shall inure to
the benefit of the parties hereto and their permitted
assigns. Except as expressly provided in Section 11
hereof, this Agreement is entered into solely for the
benefit of the parties hereto, and the provisions of
this Agreement shall be for the sole and exclusive
benefit of such parties. Except as expressly provided
in Section 11 hereof, nothing herein contained will be
deemed to create any third party beneficiaries or confer
any benefit or Rights on or to any Person not a party
hereto, and no Person not a party hereto shall be
entitled to enforce any provisions hereof or exercise
any Rights hereunder.

13.6 <u>Publicity</u>. The parties agree that no
publicity release or announcement concerning the
transactions contemplated hereby shall be issued by any
party on or prior to the Closing Date without the
advance consent of the other, except as required by
applicable law.

13.7 <u>Construction</u>. As used in this Agreement,
the masculine shall include the feminine and neuter, the
singular shall include the plural and the plural shall
include the singular, as the context may require.

13.8 <u>Waiver</u>. Neither the waiver by either of
the parties hereto of a breach of or a default under any
of the provisions of this Agreement, nor the failure of
either of the parties, on one or more occasions, to
enforce any of the provisions of this Agreement or to
exercise any Right or privilege hereunder shall
thereafter be construed as a waiver of any subsequent
breach or default of a similar nature, or as a waiver of
any provisions, Rights, or privileges hereunder.

13.9 <u>Non-Business Days</u>, If any obligation of a
party hereto falls due on a Saturday, Sunday or a legal
holiday recognized by the United States Government or
the States of Connecticut, New York or New Jersey, then
such obligation shall automatically be postponed until
the next business day.

13.10 <u>Costs and Expenses</u>. Each party hereto
shall pay its own expenses incident to this Agreement
and the transactions contemplated hereunder. If any
Claim is brought by any broker or finder based upon any
retention or purported retention by Roche or Perkin-
Elmer in connection with the transaction contemplated
hereby, the party who purportedly retained such broker

- 44 -

or finder shall indemnify and hold the other party harmless with respect to any such Claim.

13.11  Counterparts.  To facilitate execution, this Agreement may be executed in as many counterparts as may be required; and it shall not be necessary that the signature of, or on behalf of, each party, or that the signatures of all persons required to bind any party, appear on each counterpart; but it shall be sufficient that the signature of, or on behalf of, each party, or that the signatures of the persons required to bind any party, appear on one or more such counterparts. All counterparts shall collectively constitute a single agreement.

13.12  Schedules and Exhibits.  Each Schedule and Exhibit hereto is incorporated by reference and made a part of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

HOFFMANN-LA ROCHE INC.

By _____

ROCHE PROBE, INC.

By _____

PERKIN-ELMER CORPORATION

By _____

- 43 -

or finder shall indemnify and hold the other party
harmless with respect to any such Claim.

13.11  Counterparts.  To facilitate execution,
this Agreement may be executed in as many counterparts
as may be required; and it shall not be necessary that
the signature of, or on behalf of, each party, or that
the signatures of all persons required to bind any
party, appear on each counterpart; but it shall be
sufficient that the signature of, or on behalf of, each
party, or that the signatures of the persons required to
bind any party, appear on one or more such counterparts.
All counterparts shall collectively constitute a single
agreement.

13.12  Schedules and Exhibits.  Each Schedule and
Exhibit hereto is incorporated by reference and made a
part of this Agreement.

IN WITNESS WHEREOF, the parties hereto have
executed this Agreement as of the date first above
written.

                              HOFFMANN-LA ROCHE INC.


                              By_____


                              ROCHE PROBE, INC.


                              By_____


                              PERKIN-ELMER CORPORATION


                              By _Jayme N. Kelley_